540 F.2d 1283
 4 O.S.H. Cas.(BNA) 1606, 1976-1977 O.S.H.D. ( 21,025
 John T. DUNLOP, Secretary of Labor, Petitioner,
v.
ROCKWELL INTERNATIONAL (formerly North American Rockwell
Corp.) and the Occupational Safety and Health
Review Commission, Respondents.
 No. 75-1672.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 12, 1976.
Decided Aug. 26, 1976.
 
 Michael H. Levin, Counsel for Appellate Litigation, Kenneth A. Hellman, Allen H. Feldman, U. S. Dept. of Labor, Washington, D. C., for petitioner.
 Harry T. Quick, Arter & Hadden, Cleveland, Ohio, William S. McLaughlin, Executive Secretary, Occupational Safety and Health Review Commission, Washington, D. C., for respondents.
 Allen H. Sachsel, App. Sect., Dept. of Justice, Washington, D. C., for Occupational Safety & Health Review Commission.
 Before EDWARDS and CELEBREZZE, Circuit Judges, and McALLISTER, Senior Circuit Judge.
 CELEBREZZE, Circuit Judge.
 
 
 1
 This action is before the Court pursuant to 29 U.S.C. § 660(b), which authorizes the Secretary of Labor (hereinafter "Secretary") to petition for either review or enforcement of any final order of the Occupational Safety and Health Review Commission (hereinafter "Commission").
 
 
 2
 In January of 1973, Rockwell International Corp. (hereinafter "Rockwell") was operating a plant in Ashtabula, Ohio. One of the machines in the plant, grinder # 048, was utilized for removing excess amounts of lining material from brake shoes. Much of the materials and products shipped to and from the plant traveled in interstate commerce. Rockwell thus had to comply with the Occupational Health and Safety Act of 1970, 29 U.S.C. §§ 651-678 (hereinafter "the Act"), and the regulations promulgated thereunder by the Secretary. The Act's purpose is "to provide for the general welfare (and) to assure as far as possible to every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources."[1] The Act authorizes the Secretary to set health and safety standards, to conduct inspections, and to issue citations and proposed penalties. The Commission is established as an independent agency authorized to carry out the adjudicatory functions arising out of enforcement of the Act and is empowered to issue orders, based on findings of fact, "affirming, modifying, or vacating the Secretary's citation or proposed penalty, or directing other appropriate relief. . . ."[2]
 
 
 3
 One of the health and safety standards promulgated by the Secretary, 29 CFR § 1910.93a, delineates the allowable number of asbestos fibers in the breathing zone of an employee at peak periods and during an eight-hour workday. Based on the results of an inspection by the Secretary conducted on January 23, 1973, a citation charging a serious violation of the asbestos fiber standards was issued to Rockwell. Section 666(j) defines a "serious" violation:
 
 
 4
 (j) For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.
 
 
 5
 Section 666(b) sets forth the penalty for such a violation:
 
 
 6
 (b) Any employer who has received a citation for a serious violation of the requirements of section 654 of this title, of any standard, rule, or order promulgated pursuant to section 655 of this title, or of any regulations prescribed pursuant to this chapter, shall be assessed a civil penalty of up to $1,000 for each such violation.
 
 
 7
 Specifically, it was charged that Rockwell violated 29 CFR §§ 1910.93a(b)(1) and (3), (c), (1),[3] and 29 CFR 1910.134(a)(2), which section requires that employers provide respirators to employees "when such equipment is necessary to protect the health of the employee."
 
 
 8
 On March 27, 1973, the Secretary, pursuant to § 659, sent Rockwell a "Notification of Proposed Penalty" in the amount of $800. Rockwell contested the citation and the proposed penalty. The Secretary advised the Commission that Rockwell was contesting the matter and the Commission assigned the case for a hearing before an administrative law judge. The judge is empowered to report recommended findings of fact and conclusions of law to the Commission. Before the judge, Rockwell noted that it had installed an extensive filtering and exhaust system on grinder # 048 and that on three occasions in the two years prior to the Secretary's tests it had retained an independent testing laboratory to check for excessive amounts of asbestos fibers in the breathing zone of employees. Each of these three prior tests indicated that the number of asbestos fibers in the vicinity of machine # 048 was within then-existing safety standards. Rockwell contends that by installing safety equipment, and by regularly maintaining and periodically checking that equipment, it exercised reasonable diligence and did not know that excessive and unhealthy amounts of asbestos fibers were in the breathing zone of the operator of machine # 048.
 
 
 9
 Following a hearing, the administrative law judge, in his Decision and Order, made a factual finding that
 
 
 10
 "Respondent's initiative in providing for atmospheric testing prior to January 24, 1973, was an exercise of reasonable diligence intended to determine the existence or non-existence of a violation of the atmospheric health and safety standards established by the Secretary."[4]
 
 
 11
 The judge concluded that Rockwell's failure to comply with the cited regulations did not rise to the level of a serious violation of the Act due to Rockwell's failure to appreciate the violative facts despite the exercise of reasonable diligence. The judge concluded that Rockwell was guilty of a non-serious violation and affirmed the citation and penalty on that basis. The Act does not state the elements of a "non-serious" violation, but the penalty imposed by the judge was within the range allowed for such a violation in § 666(c):
 
 
 12
 (c) Any employer who has received a citation for a violation of the requirements of section 654 of this title, of any standard, rule, or order promulgated pursuant to section 655 of this title, or of regulations prescribed pursuant to this chapter, and such violation is specifically determined not to be of a serious nature, may be assessed a civil penalty of up to $1,000 for each such violation.
 
 
 13
 The Commission, by a 2-1 vote, vacated the citation and proposed penalty. The result, enunciated by Chairman Moran in the lead opinion, was concurred in separately by Commissioner Van Namee. Commissioner Cleary filed a dissenting opinion.
 
 
 14
 Chairman Moran concluded that employer knowledge of violative facts was an element of both serious and non-serious violations. Commissioner Van Namee concluded that Rockwell had been guilty of a non-serious violation because, in his view, employer knowledge of the operative facts was not an element of a non-serious violation. He noted that the instant violation was "technical" and vacation was proper. Commissioner Cleary dissented, concluding from a review of the facts that had Rockwell exercised "reasonable diligence" it would have discovered that grinder # 048 was emitting excessive amounts of asbestos fibers under certain production conditions.
 
 
 15
 The Secretary petitioned the Court for review of the Commission's order. Rockwell and the Commission contend that the Commission's decision should be affirmed.
 
 
 16
 The Secretary raises two issues. The thrust of the Secretary's first issue is that the Commission erred in failing to uphold the citation for a serious violation. Should the Court not be persuaded by his first argument, the Secretary then contends that the Commission should have affirmed the citation and proposed penalty on the basis of a non-serious violation.
 
 
 17
 In contending that the Commission should have found Rockwell in serious violation of the Act, the Secretary first attempts to reargue the facts upon which the Commission found that Rockwell had been reasonable and diligent in its attempts to furnish its employees a safe working environment. The Secretary next argues that the Commission's interpretation of the term "reasonable diligence" as used in § 666(j), defining a serious violation of the Act, is inconsistent with prior Commission interpretations of the phrase. The Secretary also contends that the Commission's interpretation does not comport with the preventative purposes of the Act.
 
 
 18
 We will first consider the Secretary's argument that the facts support a finding that, at the time of the Secretary's test, Rockwell knew or should have known that excessive amounts of asbestos fibers were in the breathing zone of workers near grinder # 048. We begin by noting that the Commission had the benefit of a lengthy record consisting primarily of testimony given by a number of witnesses at the hearing conducted by the administrative law judge. These witnesses furnished testimony favorable to both parties to the hearing.
 
 
 19
 Section 660(a) makes the Commission's findings of fact subject to our review under the "substantial evidence" standard:
 
 
 20
 "The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, should be conclusive."
 
 
 21
 Atlas Roofing Co., Inc., v. OSHRC, 518 F.2d 990, 1013 (5th Cir. 1975); Budd Co. v. OSHRC, 513 F.2d 201, 204 (3rd Cir. 1975); Brennan v. OSHRC (Hendrix), 511 F.2d 1139, 1143-1144 (9th Cir. 1975); Brennan v. Gilles & Cotting, Inc., 504 F.2d 1255, 1262 (4th Cir. 1974); Brennan v. OSHRC (Republic Creosoting Co.), 501 F.2d 1196, 1198-1199 (7th Cir. 1974); Brennan v. OSHRC (Interstate Glass Co.), 487 F.2d 438, 442 (8th Cir. 1973).
 
 
 22
 We defined "substantial evidence" in the context of review of a Civil Service Commission determination in Jones v. Priebe, 489 F.2d 709, 710 (6th Cir. 1973):
 
 
 23
 "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' (citation omitted), . . . and it must be enough to warrant denial of a motion for a directed verdict in a civil case tried to a jury."
 
 
 24
 Although the majority Commissioners wrote separate opinions, they made virtually identical findings of fact. Both found that Rockwell had installed an exhaust system to remove the pollutants created by operation of grinder # 048. Both Commissioners determined that Rockwell had been diligent by retaining an independent laboratory to test the atmosphere in the plant for airborne pollutants. Both Commissioners found that the test results indicated that on all three test dates, spanning a two and one-half year period prior to the Secretary's test, the exhaust system was functioning properly and the level of asbestos fibers in the air posed no health hazard. Both Commissioners found that Rockwell had been reasonable in its efforts to determine if employees were exposed to atmospheric hazards.
 
 
 25
 A review of the record demonstrates that there is substantial evidence of record supporting the findings of Commissioners Moran and Van Namee. In September of 1970, Rockwell retained Clayton and Associates of Southfield, Michigan, a reputable independent testing laboratory, to test the atmosphere in the vicinity of grinder # 048.[5] Additional tests were conducted by the laboratory in July of 1971 and October of 1972. Although the results of these tests were not expressed in terms now required by the asbestos regulation, they indicated that the level of asbestos fibers posed no health hazard.
 
 
 26
 Melvin Davis, a Rockwell official at the Ashtabula plant in 1971, testified that a representative of the Secretary toured the plant in August of 1971 and commended Rockwell on seeking out a private firm to test the quality of air in the plant and stated,
 
 
 27
 "There does not . . . appear to be any (asbestos) problem (in the plant)."[6]
 
 
 28
 Larry Vanderroest, Rockwell's assistant manager of personnel and industrial relations at the Ashtabula plant, testified that in late 1971 a representative of the Secretary reviewed the results of the 1971 test and termed them "very commendable."[7]
 
 
 29
 Having concluded that there is substantial evidence of record supporting the Commission's findings, those findings become conclusive as we turn to consideration of the Secretary's remaining contentions.
 
 
 30
 The Secretary contends that the Commission's interpretation of 666(j) is inconsistent with the policy of the Act and with prior Commission interpretation of that section.
 
 
 31
 A number of circuits have explicitly or implicitly concluded that the proper standard to be applied when reviewing a Commission decision is set out in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A):
 
 
 32
 "The reviewing court shall
 
 
 33
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be
 
 
 34
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."
 
 
 35
 See, Intercounty Construction Co. v. OSHRC, 522 F.2d 777, 779 (4th Cir. 1975), cert. denied, 423 U.S. 1072, 96 S.Ct. 854, 47 L.Ed.2d 82, 44 U.S.L.W. 3416 (1976); Brennan v. OSHRC (Kesler and Sons Construction Co.), 513 F.2d 553, 555-56 (10th Cir. 1975); Budd Co. v. OSHRC, 513 F.2d 201, 204 (3rd Cir. 1975); Brennan v. OSHRC (Hendrix ), 511 F.2d 1139, 1141 (9th Cir. 1975); Brennan v. OSHRC (Republic Creosoting ), 501 F.2d 1196, 1198 (7th Cir. 1974).
 
 
 36
 The Supreme Court in Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc. et al., 419 U.S. 281, 285-286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), stated:
 
 
 37
 "Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' The agency must articulate a 'rational connection between the facts found and the choice made.' . . . While we may not supply a reasoned basis for the agency's action that the agency itself has not given, . . . we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. (Citation deleted.)"
 
 
 38
 Section 666(j) clearly includes as one of the elements of a serious violation that the employer know or with the exercise of "reasonable diligence" could have known of the violative facts. The Commission's findings that Rockwell had been both reasonable and diligent and still unaware of the violative facts precludes the conclusion that Rockwell committed a serious violation. In so holding, the Commission is effecting the plain meaning of the statute. It is difficult to see how such a reading, assuming the above findings of fact, could be at variance with the policy of the Act.
 
 
 39
 The Secretary contends that Rockwell received employee warnings which alerted it to the asbestos fiber problem caused by machine # 048. The Secretary further contends that to have been "reasonably diligent," as required by § 666(j), Rockwell would have to have taken appropriate action in response to these complaints. Although the Secretary would have the Court view this contention as a question of law, we decline. What Rockwell knew about asbestos emission of grinder # 048 and what actions the company took to periodically check the efficiency of the exhaust system which it installed on the machine are clearly questions of fact. The majority Commissioners resolved these factual questions in favor of Rockwell. Their findings are supported by the record and we cannot allow the Secretary to reargue them by framing his issue as one of law rather than fact.
 
 
 40
 The Secretary also contends that the Commission's conclusion that Rockwell had been reasonably diligent was an improper interpretation of a section of the asbestos regulation, 29 CFR 1910.93a(f)(2)(ii). That section requires that employers take atmospheric samples "of such frequency and pattern as to represent with reasonable accuracy the levels of exposure of the employees." We need not reach this question, for our conclusions as to Rockwell's compliance with the Act will a fortiori resolve the question of compliance with the regulations promulgated to implement the Act.
 
 
 41
 Finally, the Secretary contends that this decision of the Commission is inconsistent with prior Commission decisions, citing Getty Oil Co., 2 OSHC 1687 (1975), petition for review pending before the Fifth Circuit; and Hydrate Battery Corp., 2 OSHC 1719 (1975).
 
 
 42
 After a review of the two Commission decisions cited by the Secretary, we adhere to our conclusion that the facts dictate a finding that Rockwell did not violate § 666(j). In Getty Oil Co., the Commission applied an "ordinary prudent employer" standard to an employer's failure to double check instructions given to an employee. In the instant action the Commission concluded that Rockwell had been a reasonable and diligent employer. This holding, given the Commission's findings of fact, does not conflict with the Commission's application of the "ordinary prudent employer" standard to a completely dissimilar set of facts in Getty Oil Co.
 
 
 43
 The Commission in Hydrate Battery, adopted an administrative law judge's report which reduced to non-serious an alleged serious violation of the airborne lead standard. We discuss this decision below in considering whether Rockwell should have been cited for a non-serious violation, but since it does not discuss the issue of scienter, it is of little efficacy here. The Commission did not err in concluding that the Secretary failed to prove the scienter element of a serious violation of the Act.
 
 
 44
 In his second issue the Secretary challenges the Commission's vacation of the citation, claiming that, at minimum, the Commission should have found a non-serious violation of the Act. As with the first issue, the Secretary contends that the facts, the policy of the Act, and prior Commission decisions require the finding of a non-serious violation. In arguing this issue the Secretary also contends that prior judicial decisions require the finding of a non-serious violation.
 
 
 45
 As noted above, § 666(c) does not set out the elements of a non-serious violation, stating only that if a "violation is specifically determined not to be of a serious nature, (the employer) may be assessed a civil penalty of up to $1000 for each such violation."
 
 
 46
 The results of the Secretary's January 23, 1973, test establish that a dangerous number of asbestos fibers were airborne near grinder # 048 on that date. The facts as found by the Commission, conclusive for purposes of our review, are that Rockwell did not know and could not in the exercise of reasonable diligence have known of the dangerous condition.
 
 
 47
 In the Commission decision, the majority Commissioners differed as to the appropriate construction of § 666(c). Chairman Moran, in the lead opinion, stated that he considered either actual or constructive knowledge of the hazard to be an element of any violation of the Act, citing Secretary v. Mountain States Telephone and Telegraph, 1 O.S.H.C. 1077, 1078 (1973). Chairman Moran therefore concluded that vacation of the citation and penalty was appropriate. Commissioner Van Namee determined that the excess amount of asbestos fibers which the Secretary's test found in the air near machine # 048 was "a single unexplained instance," and concluded that such noncompliance with a health and safety standard where, as here, an employer did not know of and could not have reasonably known of the noncompliance, constitutes a non-serious violation of the Act, citing CAM Industries, Inc., 1 O.S.H.C. 1564 (1974). Commissioner Van Namee considered such a violation to be only "technical" and on that basis concurred in vacation of the citation and penalty.
 
 
 48
 The Secretary contends that Chairman Moran erred in construing § 666(c) to include a knowledge element. The Secretary also contends that Commissioner Van Namee erred, after concluding that there was a "technical" violation, in determining that the citation should be vacated.
 
 
 49
 The members of the Commission are appointed by the President by virtue of their specialized "training, education, or experience". 29 U.S.C. § 661(a). The Act empowers the Commission to perform "the final administrative adjudication of the Act." Brennan v. OSHRC (Fiegen, Inc.), 513 F.2d 713, 716 (8th Cir. 1975). The Court should therefore show great deference to the Commission's interpretation of the Act, providing that either the interpretation is consistent with prior Commission construction of the Act or, if inconsistent, that the change be satisfactorily explained. Intercounty Construction Co. v. OSHRC, supra, at 779; Budd Co. v. OSHRC, supra, at 204; Brennan v. Gilles & Cotting, Inc., supra, at 1262; Brennan v. OSHRC (Republic Creosoting), supra, at 1198.
 
 
 50
 We first consider whether the Commission's decision in this action is precluded by prior Commission interpretations of the Act. The Secretary cites CAM Industries, upon which Commissioner Van Namee relies, and Hydrate Battery, as supporting the position that employer knowledge is not an element of a non-serious violation. The Secretary does not discuss Mountain States, upon which Chairman Moran relies, but that decision supports the Chairman's interpretation. He wrote the lead opinion in Mountain States, Commissioners Burch and Van Namee wrote separate concurrences. Mountain States arose out of the death of an employee, apparently caused by a shock received from a portable electric wrench which short-circuited. Chairman Moran and Commissioner Burch found that the employer did not know and could not in the exercise of reasonable diligence have known that the wrench would short circuit. Chairman Moran analyzed the statement of purpose and policy contained in § 651 and noted that the purpose of the Act was to prevent injuries to employees by requiring safe working conditions in any place of employment in interstate commerce. The chairman noted that the first enumerated policy for achieving safe working conditions was:
 
 
 51
 (1) by encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment, and to stimulate employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions:[8]
 
 
 52
 After concluding that it was not the intention of the Act to make employers insurers of employee safety, the Chairman explained his rationale for this conclusion:
 
 
 53
 "If an employer, as the (administrative law judge) found in this case did not and could not with the exercise of reasonably diligence have known that the tool being used by his employee was unsafe neither he, nor the Secretary, nor this Commission could have devised any program to prevent this employee's death. Consequently, the interpretation placed upon this standard by the Judge does not implement the purpose of the Act."[9]
 
 
 54
 Commissioner Burch concurred in the result and agreed with the Chairman on the issue of knowledge, stating that "knowledge is relevant to a non-serious violation."[10] Commissioner Van Namee concurred in the result, but espoused the same position which he takes in the instant action, that knowledge is not an element of a non-serious violation, but that such a violation is "technical" and no civil penalty should be assessed.
 
 
 55
 The Secretary and Commissioner Van Namee cite CAM Industries, Inc., 1 O.S.H.C. 1564 (1974), in support of the conclusion that knowledge is not an element of a non-serious violation. However, a review of that decision demonstrates that there, as here, Commissioner Van Namee was the only Commissioner to conclude that knowledge was not an element of a non-serious violation.
 
 
 56
 Commissioner Cleary and Chairman Moran each wrote separate concurring and dissenting opinions in CAM Industries and did not embrace Commissioner Van Namee's position on this issue. Commissioner Cleary did not reach the issue of the employer's lack of knowledge and Chairman Moran took the position that knowledge was an element of a non-serious violation.
 
 
 57
 Hydrate Battery, decided by the Commission nine days before this action, reaches a result which the Secretary maintains is contrary to the Commission's decision in this action. In Hydrate Battery, the Commission affirmed the report of an administrative law judge which reduced to non-serious a citation for a serious violation. The Commission also affirmed vacation of the proposed penalty for the violation. The Commission's decision and the administrative law judge's report do not discuss the question of knowledge. The citation was reduced to non-serious because there was no evidence of record to demonstrate that death or serious physical injury would result from the conditions proven. We thus gain no insight as to the Commission's position on whether knowledge is an element of a non-serious violation. The Commission has the authority to change the position on knowledge which it established in Mountain States, but such change must be clearly stated and accompanied by a statement of the reasoning behind the change. Brennan v. Gilles & Cotting, Inc., supra, at 1264. Mountain States thus stands as the Commission's only interpretation of § 666(c) and does not preclude the result reached in the instant decision.
 
 
 58
 The Secretary next argues that judicial interpretation of § 666(c) precludes the Commissioner's interpretation in the instant decision, citing Atlas Roofing Co. v. OSHRC, 518 F.2d 990, 1001 (5th Cir. 1975), and National Realty and Construction Co. v. OSHRC, 160 U.S.App.D.C. 133, 489 F.2d 1257, 1265 n. 34 (1973).
 
 
 59
 The National Realty footnote is inapposite. It contains no discussion of the issue.
 
 
 60
 Atlas Roofing involved an employer contesting a citation which charged a serious violation of the Act. The Fifth Circuit issued a lengthy opinion dealing with the issue of whether a serious violation had been committed. In a footnote, the Atlas Roofing Court commented without discussion that § 666(c) permits penalties for non-serious violations irrespective of scienter.
 
 
 61
 While relying primarily on this sentence in a footnote to a decision dealing with completely different issues, the Secretary attempts to distinguish the one decision, Brennan v. OSHRC (Hendrix), 511 F.2d 1139, 1143-1145 (9th Cir. 1975), which discusses at length the issue of whether knowledge is an element of a non-serious violation of the Act. The Ninth Circuit, in Hendrix, analyzed the Act and concluded that employer knowledge is an element of a non-serious violation. The Court thoroughly reviewed the Act and concluded that Congress intended "violation" to have a uniform meaning throughout the Act. The Court noted that § 666(c), contains the only mention of a violation which is "not . . . serious." Section (c) states that a civil penalty of up to $1000 may be assessed for each such violation. Section 666(b) states that a civil penalty of up to $1000 shall be assessed for a serious violation. The Court in Hendrix concluded:
 
 
 62
 "(w)hether the assessment be mandatory or permissive is made to turn solely on the nature of the violation, not on the presence or absence of employer knowledge."[11]
 
 
 63
 Hendrix is the only judicial decision which discusses whether employer knowledge is an element of a non-serious violation. The Ninth Circuit, without discussing Mountain States, resolved the issue in the same manner as the Commission did in that decision. Thus the Secretary's argument that judicial construction of § 666(c) precludes the Commission's construction must fail.
 
 
 64
 Finally, the Secretary argues that the Commission's decision is at variance with the policy of the Act. The Secretary contends that if the Commission had affirmed the citation and proposed penalty Rockwell would have been spurred to more effectively maintain the exhaust system on grinder # 048.
 
 
 65
 As noted in Mountain States by Chairman Moran and by the Ninth Circuit in Hendrix, it was not the purpose of the Act to make an employer the insurer of the safety of his employees. The Act is aimed at providing working men and women safe and healthful working conditions "so far as possible."[12] Employers are to be stimulated to institute new safety programs and improve such existing programs. The Act envisions cooperative efforts between employers, employees, researchers, and federal and state safety officials. Voluminous regulations have been promulgated or adopted pursuant to the Act. An employer's task in attempting to comply with these regulations is formidable. It seems clear that the Act was meant to compel employers to thoroughly scrutinize their places of employment in an effort to locate and remedy hazardous conditions. Given the myriad promulgated standards, a conscientious employer, even one with a small or medium size facility, will likely expend significant time and effort in bringing his facility into compliance with existing health and safety standards. Even the less-than-conscientious employer, when facing the prospect of penalties of up to $1000 per non-serious violation, may attempt to improve the safety of his facility before the Secretary's representatives issue citations in an effort to secure compliance. This had to be the hope of the framers of the Act since it would take an army of compliance officers to effect nationwide compliance were it not for the voluntary cooperation of thousands of employers. The employer's task is difficult enough without adding responsibility for potentially hazardous circumstances of which the employer is unaware and could not discover with the exercise of reasonable diligence. The Commission's findings of fact were that Rockwell could not have known that the exhaust system of grinder # 048 would not function effectively on the day the Secretary tested. On that date the exhaust systems on Rockwell's other grinders were functioning properly and on three prior occasions tests demonstrated that all of the exhaust systems were functioning effectively. The Act asks employers to make a reasonable and a diligent effort to comply with safety standards, neither the Secretary, the Commission, nor this Court can hold an employer to a higher standard.
 
 
 66
 The decision of the Commission is not precluded by prior judicial or Commission decisions and the Commission articulated a rational connection between the facts found and the choice made. We affirm.
 
 
 67
 EDWARDS, Circuit Judge, dissenting.
 
 
 68
 In this case the Secretary of Labor petitions this court for review of a decision of the Occupational Safety and Health Review Commission vacating a citation against Rockwell International for a "serious" violation of Section 5(a)(2) of the Occupational Health and Safety Act of 1970, 29 U.S.C. § 654(a) (2) (1970).[1] The Secretary's citation charged, specifically, that Rockwell had exposed its employees to asbestos dust in excess of the levels permitted by the applicable standard, 29 C.F.R. § 1910.93(b) (1972).[2] The standard provides:
 
 
 69
 (b) Permissible exposure to airborne concentrations of asbestos fibers (1) Standard effective July 7, 1972. The 8-hour time-weighted average airborne concentrations of asbestos fibers to which any employee may be exposed shall not exceed five fibers, longer than 5 micrometers, per cubic centimeter of air, as determined by the method prescribed in paragraph (e) of this section.
 
 
 70
 (3) Ceiling concentration. No employee shall be exposed at any time to airborne concentrations of asbestos fibers in excess of 10 fibers, longer than 5 micrometers, per cubic centimeter of air, as determined by the method prescribed in paragraph (e) of this section.
 
 
 71
 (c) Methods of compliance (1) Engineering methods. (i) Engineering controls. Engineering controls, such as, but not limited to, isolation, enclosure, exhaust ventilation, and dust collection, shall be used to meet the exposure limits prescribed in paragraph (b) of this section.
 
 
 72
 A pulmonary specialist who served as expert witness at the hearing upon this case before an Administrative Law Judge designated by the Commission described the problem which underlies this dispute:
 
 
 73
 Asbestosis . . . is primarily caused by the inhalation of a particulate matter now known to be a fiber . . . which (is) contained in various materials (including) . . . brake shoe linings . . . . (T)hese (fibers) are then inhaled into the lungs and . . . they are trapped in there and once they're in there, there is no way out. Once they're in there, they're in there for good and this little fiber then sets up an allergic reaction where fluid bursts out into small tiny pockets of the lung, and this fluid pours out on the top of this fiber and it's covered with protein and sooner or later with iron. The iron then stains this . . . so it can be identified if we should do a biopsy or something like this.
 
 
 74
 There is no question but that Congress had asbestosis in mind in the adoption of the Occupational Health and Safety Act. During Congressional debate Senator Saxbe stated:
 
 
 75
 There is no question in my mind that if one works as an insulation installer on steampipes or hot air pipes and is using asbestos in any way, shape or form, there is no way in which he can avoid a shortened life expectancy under the present safety rules. It is a real question to me as to whether asbestos can be used at all, whether it can be handled.
 
 
 76
 We have come to the point now that protective breathing apparatus is used, but the asbestos fiber is very fine, and it builds up in the lungs over a long period of time. Asbestos, unlike other dust or fibers, is never assimilated and it is never removed from the lungs. It stays there, and it * * * only become(s) more difficult to breathe the longer one works with it. (Emphasis added.)
 
 
 77
 Legislative History of the Occupational Safety and Health Act of 1970, 92nd Cong., 1st Sess. 337-38 (Comm. Print 1971).
 
 
 78
 Neither the statute nor the regulation is under attack in this litigation.
 
 
 79
 Respondent Rockwell International operates a plant at Ashtabula, Ohio, where it produces brake shoes. Its production operation requires grinding of the brake lining material which contains asbestos. The machines have a vacuum suction system designed to keep the asbestos particles out of the air. This record contains undisputed testimony, however, that from time to time the air cleaning system malfunctions resulting in a "spew" of finely ground material into the air.
 
 
 80
 On January 24, 1973, an OSHA compliance officer made a routine inspection of the Rockwell Ashtabula plant. Near grinder # 048 the compliance officer took four samples which on an eight-hour time-weighted average showed 7.4 asbestos fibers over 5 micrometers in length per cubic centimeter of air. One of these samples showed 19.5 fibers per cubic centimeter.
 
 
 81
 On the basis of this inspection the Secretary of Labor cited respondent Rockwell for a "serious violation" of the Occupational Health and Safety Act. The Secretary ordered abatement of the condition by October 31, 1973, and proposed fines of $800.
 
 
 82
 Rockwell contested both the citation and the penalty under 29 U.S.C. § 659(c) (1970), whereupon respondent Occupational Health and Safety Review Commission assigned the case for hearing to an Administrative Law Judge. The ALJ conducted an evidentiary hearing taking considerable testimony from Labor Department personnel, from experts hired by Rockwell, and from Rockwell's employees.
 
 
 83
 Rockwell's defense before the ALJ was that it could not properly be held responsible for a "serious violation" because four tests which it had conducted by a reputable testing organization, George Clayton and Associates, had shown no violation of the applicable regulations. Under Section 17(k) of the Act, 29 U.S.C. § 666(j) (1970), an employer is not guilty of a "serious violation" if it "did not, and could not with the exercise of reasonable diligence know of the presence of the violation." Rockwell's position is that the Clayton tests constituted the exercise of reasonable diligence under § 17(k).
 
 The Administrative Law Judge found:
 
 84
 3. On January 24, 1973 Respondent was in violation of 29 CFR 1910.93a(b)(1) and (3) and (c)(1).
 
 
 85
 4. Although the violation of 29 CFR 1910.93a was one which could result in death or serious physical harm to Respondent's employees, the violation must be treated as a non-serious violation because Respondent had, prior to the Secretary's inspection on January 24, 1973, made reasonable and diligent efforts to determine whether or not a violation existed and because Respondent was entitled to rely upon test results which failed to disclose the existence of dangerously high concentration of asbestos fibers in the atmosphere surrounding grinder No. 048.
 
 
 86
 5. Because the tests performed by Respondent's testing laboratory did not prior to January 24, 1973 disclose the presence of harmful contaminants in the atmosphere surrounding grinder No. 048, the provisions of 29 CFR 1910.134(a)(2) did not come into play. Hence, Respondent cannot be held to have been in violation of this regulation on the date of inspection.
 
 
 87
 6. The penalty proposed by the Secretary for Respondent's violation of 29 CFR 1910.93a is valid and appropriate under the circumstances herein and fully in accord with the requirements of Section 17(j) of the Act.
 
 
 88
 The Administrative Law Judge reduced the violation to the classification of a "nonserious" violation and in all other respects affirmed the Secretary of Labor's findings, penalty and remedy.
 
 
 89
 On appeal by the Secretary of Labor to the Occupational Safety and Health Commission, a two-man majority of the Commission for quite different reasons reversed the findings of the Administrative Law Judge and vacated the penalty and remedial order. Commissioner Moran held that "the evidence does not establish that the respondent possessed the requisite knowledge of the violation." Commissioner VanNamee concurred in vacation of the citation. He stated that "noncompliance with a standard of which the employer did not and could not have reasonably known, constitutes a nonserious violation." However, he termed the violation a "technical" one and assented to "the vacation of such citations when to find a violation would serve no useful purpose." Commissioner Cleary in dissent found that his colleagues had ignored relevant evidence concerning Rockwell's claimed reasonable diligence and concluded that Rockwell was in "serious violation" of the Act.
 
 
 90
 The most surprising aspect of this record is that the ALJ and the two Commissioners arrived at their conclusions holding that Rockwell had exercised "reasonable diligence" by totally ignoring much additional relevant evidence which the Secretary offered at the hearing.
 
 
 91
 This evidence was given by Rockwell employees, including an operator of grinder # 048 and a maintenance man who maintained the exhaust system for the grinders. The testimony, if credited, would have shown the following facts:
 
 
 92
 1) Different sized brake shoes, ranging from 11/4 to 8 were ground at respondent's plant (and specifically on grinder # 048), and the amount of material removed by the grinding (and, hence, the quantity of dust) would vary with the size of the brake shoe being ground. On the date of the test which resulted in the citation, a 7 brake shoe was being ground on grinder # 048.[3]
 
 
 93
 2) On the occasion which produced the citation there was visible dust in the air in the vicinity of grinder # 048. On many other occasions, when no air samples were being taken, there were similar dust conditions.
 
 
 94
 3) On many occasions the dust collector system malfunctioned because of failure to empty the dust collector bags (or to empty them properly). These malfunctions resulted in "spews" of grinder dust into the plant atmosphere.
 
 
 95
 4) While the dust collection bags were supposed to be "shaken down" once a shift by laborers, there was no regular schedule for a thorough emptying of the dust collecting bags. They were, however, emptied about once a week by a maintenance man when employees complained to the foreman about the dust condition.
 
 
 96
 5) The employees were not furnished or required to wear respirators, but were permitted when dust "spews" occurred to shut the machines down and leave their work places.
 
 
 97
 6) Management representatives knew all of the facts related above from employee complaints.
 
 
 98
 It, of course, is not this court's function to weigh this evidence as to credibility or to determine the inferences properly to be drawn from it. But it is part of our reviewing function to require an administrative agency to deal with the whole record. Here both the Administrative Law Judge and the majority of the Commission have reached their conclusion that respondent Rockwell used "reasonable diligence" within the meaning of the "serious violation" provision of the Act, 29 U.S.C. § 666(j) (1970), by simply ignoring the considerable evidence to the contrary. I would hold that the Commission's total disregard of employee testimony in this record was arbitrary, capricious and an abuse of discretion. 5 U.S.C. § 706(2)(A) (1970).
 
 
 99
 Since employee testimony cited above, if credited, would require a finding of serious violation, we should remand this case to the Commission for reconsideration on the basis of all rather than part of the record.
 
 
 100
 Since my colleagues, unfortunately, have arrived at a different conclusion on this issue, I should also point out that as a matter of law, the result reached by the majority of the Commission is completely inconsistent with the Act. 29 U.S.C. § 666(j) describes "a serious violation" and excepts therefrom any "employer (who) did not, and could not with the exercise of reasonable diligence, know of the presence of the violation."
 
 
 101
 A nonserious violation, however, is described in the following language in 29 U.S.C. § 666(c) (1970):
 
 
 102
 (c) Any employer who has received a citation for a violation of the requirements of section 654 of this title, of any standard, rule, or order promulgated pursuant to section 655 of this title, or of regulations prescribed pursuant to this chapter, and such violation is specifically determined not to be of a serious nature, may be assessed a civil penalty of up to $1,000 for each such violation.
 
 
 103
 Reading these two sections together seems to me to require the conclusion that the difference between the two is employer knowledge of the presence of the violation. Such knowledge is plainly required by 29 U.S.C. § 666(j). Equally plainly such knowledge is not required for a non-serious violation finding under 29 U.S.C. § 666(c). Brennan v. Occupational Safety & Health Review Commission and VY Lactos Laboratories, Inc., 494 F.2d 460, 463 (8th Cir. 1974); National Realty and Construction Co., Inc. v. Occupational Safety & Health Review Commission, and Secretary of Labor, 160 U.S.App.D.C. 133, 489 F.2d 1257, 1266 fn. 34 and 41 (1973).
 
 
 104
 Commissioner Moran appeared to base his decision upon a view that a lack of proof of the employer's knowledge of the presence of the violation was a basis for vacating a citation under either the serious violation subsection (j) or the nonserious violation subsection (c). As indicated above, I believe this view to be a mistake in law. The other Commissioner who composed the majority in this case believed, as indicated above, that a finding of reasonable diligence was irrelevant to the existence of a nonserious violation and explicitly found a nonserious violation. Nonetheless, he joined in vacating the citation because the violation was "technical in nature," and because an abatement order would "serve no useful purpose." I believe that the vacation of the citation under these circumstances was legal error.
 
 
 105
 It appears clear that the Commission has authority "to assess all civil penalties provided in this section, giving due consideration to the appropriateness of the penalty with respect to the size of the business of the employer being charged, the gravity of the violation, the good faith of the employer, and the history of previous violations." 29 U.S.C. § 666(i) (1970).
 
 
 106
 Under subsection (i) the Commission might, indeed, reduce the civil penalty (even to zero) on the basis of the findings required there, but the statute does not convey authority to vacate the citation. The difference is a meaningful one since 29 U.S.C. § 658(a) (1970), provides mandatorily "(i)n addition, the citation shall fix a reasonable time for the abatement of the violation." On this point the D.C. Circuit has said:
 
 
 107
 Finally, in an abundance of caution we emphasize that an instance of hazardous employee conduct may be considered preventable even if no employer could have detected the conduct, or its hazardous character, at the moment of its occurrence. Conceivably, such conduct might have been precluded through feasible precautions concerning the hiring, training, and sanctioning of employees. National Realty and Construction Co., Inc. v. Occupational Safety and Health Review Commission, 160 U.S.App.D.C. 133, 489 F.2d 1257, 1266 fn. 37 (1973).
 
 
 108
 The order for abatement in this case was vacated along with the citation.
 
 
 109
 Even if the majority of the Commission had performed their duty of considering the entire factual record, the Commission's decision should be vacated and the case should be remanded to the Commission for reinstatement of the citation and the abatement order and whatever, if any, penalty it found appropriate under 29 U.S.C. § 666(i) (1970).
 
 
 
 [1]
 29 U.S.C. § 651(b)
 
 
 [2]
 29 U.S.C. § 659(c)
 
 
 [3]
 (b) Permissible exposure to airborne concentrations of asbestos fibers (1) Standard effective July 7, 1972. The 8-hour time-weighted average airborne concentrations of asbestos fibers to which any employee may be exposed shall not exceed five fibers, longer than 5 micrometers, per cubic centimeter of air, as determined by the method prescribed in paragraph (e) of this section
 (3) Ceiling concentration. No employee shall be exposed at any time to airborne concentrations of asbestos fibers in excess of 10 fibers, longer than 5 micrometers, per cubic centimeter of air, as determined by the method prescribed in paragraph (e) of this section.
 (c) Methods of compliance (1) Engineering methods. (i) Engineering controls. Engineering controls, such as, but not limited to, isolation, enclosure, exhaust ventilation, and dust collection, shall be used to meet the exposure limits prescribed in paragraph (b) of this section.
 
 
 [4]
 Joint Appendix at 15
 
 
 [5]
 Administrative Hearing Transcript, Vol. II, pages 310-321
 
 
 [6]
 Administrative Hearing Transcript, Vol. II, page 384
 
 
 [7]
 Administrative Hearing Transcript, Vol. II, page 335
 
 
 [8]
 29 U.S.C. § 651(b)(1)
 
 
 [9]
 1 O.S.H.C. at 1078
 
 
 [10]
 Id. at 1080
 
 
 [11]
 511 F.2d at 1144
 
 
 [12]
 29 U.S.C. § 651(b)
 
 
 [1]
 This section provides that each employer "shall comply with occupational safety and health standards promulgated under this chapter."
 
 
 [2]
 The asbestos standard has been recodified at 29 C.F.R. § 1910.1001 (1975). Effective July 1, 1976, the eight-hour time-weighted average airborne concentrations of asbestos fibers to which an employee may be exposed has been considerably reduced, from five fibers over five micrometers in length to two such fibers
 
 
 [3]
 There was testimony that 7 brake shoes constituted over 10% of respondent's grinding production at the plant concerned. Additionally, respondent's witnesses testified without exception that they had not ascertained the size of the stock being ground on the occasions of their tests