577 F.2d 126
 6 O.S.H. Cas.(BNA) 1631, 1978 O.S.H.D. (CCH) P 22,791
Ray MARSHALL,* Secretary of Labor, Petitioner,
v.
CITIES SERVICE OIL CO. and Occupational Safety and Health
Review Commission, Respondents.
 No. 76-1927.
 United States Court of Appeals,
Tenth Circuit.
 Submitted March 14, 1978.
Decided June 5, 1978.
 
 Nancy L. Southard, U. S. Dept. of Labor, Washington, D. C. (Carin A. Clauss, Sol. of Labor, Alfred G. Albert, Acting Sol. of Labor, Benjamin W. Mintz, Associate Sol., Washington, D. C., for Occupational Safety and Health, Michael H. Levin and Allen H. Feldman, Washington, D. C., Counsel for App. Litigation, on briefs), for petitioner.
 Robert R. Reis, Tulsa, Okl. (Russell H. Smith, Tulsa, Okl., on brief), for respondent Cities Service Oil Co.
 Before HOLLOWAY, BARRETT and McKAY, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 The Secretary of Labor (Secretary) petitions to review and set aside an order of the Occupational Safety and Health Review Commission (Commission). The petition for review does not involve factual issues. The challenge posed relates to the propriety of the legal conclusions reached by the Commission in arriving at its ruling that Cities Service Oil Co. (Cities) had not violated the general duty clause, 29 U.S.C.A. § 654(a)(1)[1] of the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C.A. § 651, et seq. A review of the pertinent and undisputed facts should facilitate our review.
 
 
 2
 Cities owns producing oil and gas leases near Holyrood, Kansas, including an area called the Stoltenberg lease, from which is produced sour crude oil (oil containing detectable amounts of hydrogen sulfide). Within the leasehold field were a number of free water knockout tanks utilized by Cities to separate water and crude oil in order to render the oil deliverable to a pipeline. The tanks contain sacrificial anodes, consisting of blocks of magnesium which neutralize impurities in the crude oil thereby preventing corrosion of the tanks. From time to time, Cities had the tanks drained and cleaned and the anodes replaced. This work was done by independent contractors.
 
 
 3
 On August 16, 1973, the day of the alleged violation, Fry's Tank Service, Inc. (Fry's), an independent contractor, sent its employee, Jim Thach (Thach), to clean one of Cities' tanks and to replace the anodes therein. Thach had been employed by Fry's since 1971. Prior to 1971, Thach had worked for some 18 to 20 years as an independent contractor in the tank cleaning business. When Cities had contracted with Fry's to clean the tank and replace the anodes, Cities agreed to supply personnel to assist Fry's. To this end four Cities' employees, Harold Holmes (Holmes), Delbert Hendricks (Hendricks), Clyde Rathbun (Rathbun) and Dale Wittich (Wittich), were at the tank jobsite to assist Thach. Holmes, Hendricks and Rathbun each had over 25 years experience in oil field work. Rathbun was a personal friend of Thach.
 
 
 4
 After the tank was cleaned a ladder was placed in it and Thach descended the ladder stopping midway to accept an anode handed to him by one of Cities' employees. After receiving the anode, Thach completed his descent. He then placed the anode on the bottom of the tank, started back up the ladder and collapsed. Holmes entered the tank. He was able to lift Thach out of the tank to the reach of the other Cities' employees after which he also collapsed inside the tank. Thereafter, while Rathbun revived Thach and called for help, Hendricks and Wittich entered the tank in order to remove Holmes therefrom. Their efforts were to no avail, inasmuch as they, too, collapsed inside the tank. Thach then reentered the tank in an attempt to rescue Holmes, Hendricks and Wittich, but he was overcome a second time. When Rathbun returned after calling for help on a radio in his truck, he found the four men lying dead inside the tank. It was later determined that they had died of hydrogen sulfide inhalation.
 
 
 5
 Prior to the accident Cities had, repeatedly, orally instructed its employees not to enter the tanks on the Stoltenberg lease. Fry's had also instructed its employees not to enter such tanks. However, it is uncontested that at the time of the accident Cities was aware that anode replacement in this particular tank did require entry.
 
 
 6
 On August 24, 1973, eight days after the tragedy, a citation for serious violation was issued to both Cities and Fry's for failure to provide a place of employment free from recognized hazards. Serious violations arise under OSHA whenever "there is a substantial probability that death or serious physical harm could result from a condition which exists unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." As a result of receiving a citation for serious violation, Cities was fined $1,000 which was reduced by 20% for good faith and 20% because Cities had no previous inspection history by the Kansas City OSHA office. Fry's was also fined $1,000 which was reduced 20% for good faith, 20% for not having a previous inspection history, and 10% for size since Fry's had fewer than twenty employees.
 
 
 7
 The citations were administratively reviewed in the course of a two-day hearing before an administrative law judge, who entered an order upholding the citations. In so ruling, the administrative law judge noted, inter alia :
 
 
 8
 . . . hydrogen sulfide is a recognized hazardous material; Cities' argument that it had no prior knowledge of hazardous concentrations of hydrogen sulfide at the Stoltenberg lease is not acceptable; Cities health coordinator had never been to the lease to check for hydrogen-sulfide content; sour crude contains detectable amounts of hydrogen sulfide; on the date of the accident there was a recognized hazard to the employees working on the tank; Cities oral instruction to its employees not to enter the tanks did not constitute reasonable diligence on its part; Cities' employees were not warned of the dangers, including hydrogen sulfide, of entering the tank and they instinctively attempted to save Thach and each other; Cities' argument that it could not foresee that its employees would enter the tank after being instructed not to do so is not acceptable; it was entirely foreseeable that the employees might attempt the rescue of a fellow employee while working on the tank; Cities and Fry's were participating directly together even though Fry's was hired as an independent contractor; the only issue is whether Cities and Fry's furnished a place of employment free from recognized hazards; Cities should have furnished their employees with testing equipment, masks and harness equipment; and that Fry's should not have allowed Thach to work on a job it was not familiar with.
 
 
 9
 The administrative law judge thereafter incorporated his observations into detailed findings and conclusions in the order upholding the citations.
 
 
 10
 On appeal, the Commission affirmed the citation and notification of proposed penalty issued to Fry's and vacated the order upholding the citation relating to Cities. The majority opinion of the Commission stated, inter alia:
 
 
 11
 . . . The tank in question had been cleaned about every two years; the tank had been cleaned 5 or 6 times since being placed in service and was cleaned each time by Thach; when Thach was self-employed he had done other work for Cities which required entry into a "stock tank" and that he always did so while wearing a safety belt with someone outside holding a safety line attached to the belt; on the day of the accident Cities personnel worked with Thach in preparing the tank; both Fry's and Cities were aware of the hazards of hydrogen sulfide; because it knew of the hazards of entering a tank Cities instructed its employees not to enter the tanks on the Stoltenberg lease; on locations where Cities employees were required to enter confined spaces they were required to test the atmosphere prior to entry, use breathing equipment and safety lines where necessary; both Fry's and Cities recognized the hazards of hydrogen sulfide and there were readily available feasible means to protect against the hazard; Fry's violation must be affirmed, since all employees, including experienced personnel like Thach, must receive supervision concerning the hazards inherent in their employment; the gravamen of the charge against Cities is that it should have had rescue equipment available at the site so a rescue could have been effectuated without endangering its employees; although Cities was charged with failing to furnish rescue equipment it was not the party who committed the violation (entering the tank) which led to the necessity of the rescue attempt; a necessary element of a general duty clause violation is that the employer must be able to foresee the hazard to its employees; the dispositive question is whether Cities could reasonably foresee that Fry's would perform the work in an unsafe manner in violation of the Act necessitating a rescue attempt; the record does not establish that Cities "should reasonably have foreseen the violation committed by Fry's"; Cities knew the tank was being cleaned by an experienced person who, in some of the work performed for Cities, had used protective equipment; that had Thach used safety equipment on the day of the accident, it would have negated the need of Cities personnel to enter the tank in a rescue attempt; and that Cities could not foresee that Thach would work in such a manner that its employees would be endangered in attempting to rescue him.
 
 
 12
 A concurring Commission opinion[2] observed inter alia, that:
 
 
 13
 Thach's death was the result of his disobedience of the express orders of Fry's president; the Act requires that "each employee shall comply with . . . orders issued pursuant" to the Act (29 U.S.C.A. § 654(b)); employers are not to be held liable where a violation results from an employee's wilful misconduct in disobeying an employer's direct order, particularly when as here, the only endangered employee is the one who violates the order; the Act did not intend to make insurors of employers; it was reasonable for Fry's president to expect that Thach would comply with the order; as to Cities, an employer is liable under the Act only when his own employees are exposed to a hazard, and he is not liable when workers employed by another are exposed to a hazard even if it happens at his worksite; Cities cannot be in violation as a result of the hazardous exposure of Thach and the case against it must rest on the exposure of its own employees; Cities did not expose its employees to an unsafe working area, since the duties of its employees did not require entry into the tank and there was no showing that they were exposed to hazardous atmospheric conditions while working on the exterior of the tank; Cities had adequately apprised its employees of the dangers of hydrogen sulfide via its "Safety Guide" and Cities' local policy concerning tank entry; that the local rule prohibiting entry into tanks had been discussed "a number of times" at monthly safety meetings during the ten years prior to the accident; the Cities employees involved in the accident were reliable workers, three of whom had been employed by Cities for 25 years or more so that "Cities had no reason to believe that they would violate the policy of no tank entry in the normal course of duties which did not require tank entry;" Cities was not liable to provide equipment, gas masks, and lifelines on the theory that these items would be needed in the rescue of Thach; it would be unreasonable to require an employer to provide his employees with rescue equipment for the purpose of rescuing employees of independent contractors working at the employer's jobsite; each employer is responsible for the safety of his own employees; there was no good reason for Cities to expect it would be necessary to rescue Thach, who had previously changed the anodes in this tank 5 or 6 times over a period of 12 years with no ill effects; and that Cities experience over the preceding 58 years had indicated that hazardous quantities of hydrogen sulfide were not a problem in Western Kansas where the Stoltenberg lease was located.
 
 
 14
 On appeal the Secretary presents one issue: Whether the Commission erroneously absolved Cities of safety responsibilities where it (Cities) knowingly sent employees to participate in a hazardous tank-cleaning operation without protection against deadly hydrogen sulfide gas contained in that tank.
 
 
 15
 OSHA was enacted with a broad remedial purpose, i. e., protection of the worker from industrial injury. Clarkson Construction Company v. Occupational Safety and Health Review Commission, 531 F.2d 451 (10th Cir. 1976). Where there is substantial evidence in a record supportive of Commission findings, the findings must be considered conclusive on review. Stockwell Manufacturing Company v. Usery, 536 F.2d 1306 (10th Cir. 1976). The expertise of the Commission is presumed in matters of job safety. In Brennan v. Occupational Safety and Health Review Commission, 501 F.2d 1196 (7th Cir. 1974), the court observed:
 
 
 16
 We note at the outset that the . . . Commission is presumed to have technical expertise and experience in the field of job safety. A court must, therefore, defer to the findings and analysis of the Commission unless such findings are without substantial basis in fact. Federal Power Commission v. Florida Power and Light Co., 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972). The Act itself states: "The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." 29 U.S.C. § 660. In addition, the Commission's interpretations regarding the meaning of the Act should be given substantial deference by a court.
 
 
 17
 501 F.2d at 1198-1199.
 
 
 18
 Commission decisions, then, are to be upheld unless they are " arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In Dunlop v. Rockwell International, 540 F.2d 1283 (6th Cir. 1976), the court cited to Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., et al., 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), for the following:
 
 
 19
 A number of circuits have explicitly or implicitly concluded that the proper standard to be applied when reviewing a Commission decision is set out in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A):The reviewing court shall
 
 
 20
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be
 
 
 21
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.
 
 
 22
 See, Intercounty Construction Co. v. OSHRC, 522 F.2d 777, 779 (4th Cir. 1975), cert. denied, 423 U.S. 1072, 96 S.Ct. 854, 47 L.Ed.2d 82 (1976); Brennan v. OSHRC (Kesler and Sons Construction Co.), 513 F.2d 553, 555-56 (10th Cir. 1975); Budd Co. v. OSHRC, 513 F.2d 201, 204 (3rd Cir. 1975); Brennan v. OSHRC (Hendrix), 511 F.2d 1139, 1141 (9th Cir. 1975); Brennan v. OSHRC (Republic Creosoting), 501 F.2d 1196, 1198 (7th Cir. 1974).
 
 
 23
 The Supreme Court in Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc. et al., 419 U.S. 281, 285-286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), stated:
 
 
 24
 Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' The agency must articulate a 'rational connection between the facts found and the choice made.' While we may not supply a reasoned basis for the agency's actions that the agency itself has not given, . . . we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. (Citation deleted.)
 
 
 25
 540 F.2d at 1288.
 
 
 26
 Administrative adjudications of the Commission are, of necessity, entitled to great weight. In Brennan v. Occupational Safety and Health Review Commission, 502 F.2d 946 (3rd Cir. 1974), it was stated that:
 
 
 27
 . . . We may also distinguish the separate problem of a conflict between the Secretary and the Commission as to the proper interpretation of a safety standard, which may involve the statutory allocation of the rule making power (in the Secretary) and the adjudicatory function (in the Commission). See, e. g., Brennan v. Southern Contractors Service, 492 F.2d 498 (5th Cir. 1974); Brennan v. Occupational Safety & Health Review Commission (Gerosa, Inc.), 491 F.2d 1340 (2d Cir. 1974). Citations under § 10 for violation of the general duty clause involve administrative adjudications rather than rule making, and petitions for review in general duty clause cases involve more or less traditional standards for reviewing adjudications under a statute. Section 11(a), 29 U.S.C. § 660, states that we must afford to the Commission's fact-finding the same deference as to the fact-finding of such agencies as the National Labor Relations Board. See, e. g., Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N.L.R.B. v. Princeton Inn Company, 424 F.2d 264 (3rd Cir. 1970). (Emphasis supplied.)
 
 
 28
 502 F.2d at 950-951.
 
 
 29
 Applying these standards to Cities we hold that the Commission properly acted within the scope of its powers and limitations in vacating the citation and notification of proposed penalty issued to Cities. The Secretary concedes, "This petition for review presents no factual issues, but only the propriety of legal conclusions the Commission majority reached on undisputed facts found by its administrative law judge and adopted by the agency."
 
 
 30
 We cannot set aside the Commission's vacation of the citation issued Cities as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," when, as here, the dispositive, uncontested facts establish that: Cities had a local policy against tank entry; Thach had previously cleaned the very tank involved in the accident 5 or 6 times without any adverse effects; Thach had been the only person to clean the tank and replace the anodes since the tank had been placed in use; Thach had used protective equipment on other such jobs performed for Cities; in other areas where Cities' personnel were required to enter such tanks, atmospheric testing and safety equipment were required; the dangers of hydrogen sulfide were fully recognized and appreciated by Cities, which had no such prior recorded incident in 58 years at the lease site; the atmospheric working conditions outside the tank were not established to be anything but "free from recognized hazards"; OSHA's Kansas City office had no previous inspection history of Cities at the Stoltenberg lease.
 
 
 31
 The Commission's vacation of Cities' citation was logical and proper. To hold otherwise as observed in the concurring opinion, would require employees of Cities to provide rescue equipment for the purpose of rescuing employees of independent contractors working at its jobsites.
 
 
 32
 WE AFFIRM.
 
 HOLLOWAY, Circuit Judge, dissenting:
 
 33
 I respectfully dissent.
 
 
 34
 I am convinced that the undisputed findings of basic, subsidiary facts by the Administrative Law Judge are amply supported and require a ruling sustaining the citation and penalty against the respondent Cities Service Oil Company. More specifically, I am persuaded that the reasoning of Commissioner Cleary's partial dissent is sound and I will only briefly outline the reasons which lead me to agree with his views.
 
 
 35
 The lead opinion of Chairman Barnako primarily rejects the citation against respondent Cities Service on the ground that it could not reasonably have foreseen that the independent contractor Fry's would perform the work on the tank in an unsafe manner and give rise to the need for a rescue attempt. Reliance is placed on prior successful performance of the work by Thach a number of times. The lead opinion concludes that it would be an unreasonable burden for the employer to be required to anticipate every violation such as Thach's entry of the tank under conditions which constituted a § 5(a)(1) violation itself.
 
 
 36
 The basic facts are undisputed and need not be repeated. The compelling essentials are that the tragedy concerns a highly lethal substance presenting a recognized hazard, as Chairman Barnako's lead opinion notes (C.D. 5); that respondent Cities' employees were called on to assist Thach in his work; that although not in the tank, Cities' employees were working closely with Thach, in an arrangement which the Administrative Law Judge described as the "complete interlocking of Cities Service employees' activities with that of the Respondent Fry's employee," based on detailed testimony describing their work. (Administrative Law Judge's Decision, 13-14; see also Commissioner Cleary's opinion at pp. 21-24 of the Commissioners' opinions). Commissioner Cleary concluded (id. at 24):
 
 
 37
 Cities Service knew that its employees were going to assist the Fry's employee with the tank cleaning procedure. It knew that the Fry's employee had to enter the tank to replace the anodes. It knew that hydrogen sulfide gas is a recognized hazard in the Stoltenberg area of Kansas. It knew or should have known that employees who are working together as a team, regardless of prior instruction concerning entry into tanks, will set aside a specified course of conduct and react humanly to save the life of a fellow worker. See Akron Brick & Block Co., No. 4859, BNA 3 OSHC 1976, CCH OSHD para. 20,302 (1976). Furthermore, the record reveals that both qualitative and quantitative tests for hydrogen sulfide could have been performed easily by the employees on the worksite had Cities Service provided the equipment and a minimal instruction period. Indeed, since the time of the accident, Cities Service has initiated a new procedure that requires the testing of all confined spaces to be entered on its jobsite regardless of whose employees are involved. . . . Finally, it failed to provide appropriate safety equipment that, admittedly, would have enabled the Cities Service employees to rescue their fellow worker with a minimum of danger to themselves.
 
 
 38
 On this record I must agree with Commissioner Cleary's conclusion that overwhelming evidence demonstrates that respondent Cities failed to render its workplace free of the recognized hazard, and that there was a demonstrated availability of feasible measures that would have significantly reduced the likelihood of the accident.
 
 
 39
 In view of the recognized hydrogen sulfide hazard and the close working relationship of the employees of Cities with Thach, the danger to all of them and of an instinctive attempt of a rescue was real. I must agree with the Administrative Law Judge and Commissioner Cleary's view that a general duty violation occurred, giving the Act an interpretation in accord with its broad remedial purpose of protection from industrial injury. Clarkson Construction Co. v. Occupational Safety and Health Review Commission, 531 F.2d 451, 458 (10th Cir.).
 
 
 
 *
 Mr. Marshall succeeded Mr. Usery as Secretary of Labor on January 27, 1977. Fed.R.App.P. 43(c)
 
 
 [1]
 § 654(a)(1) provides:
 (a) Each employer
 (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;
 
 
 [2]
 The concurring opinion also dissented in part via its determination that a violation was not established against either Cities or Fry's